The next case for argument is 18-1600, United Technologies v. General Electric Company. Please proceed. May I please the Court? Lawrence. Yes. I'm Degan on behalf of United Technologies. The board's first error below was in its claim construction where it read out the limitation bond layer and instead crafted a construction that removed the concept of bond and merely repeated limitations that were already present in the claim. Those other limitations pertain to the location of the bond layer, its composition, but since those limitations were already in the claim, it was error to craft a construction that simply repeated them and rendered them superfluous. And so we must go back to the plain language of the claim, which is bond layer has an ordinary meaning that connotes and incorporates the concept of having adhesion, performing an adhesive function. When you're talking about the plain meaning, you're talking about the plain meaning of bond layer or the plain meaning of bond or both? It's really both. Right? So bond is an adjective that modifies layer and bond connotes this notion of adhesion. But in particular, in this field of study, in this art, as you can see from the objective sources we submitted, bond layer is also known to have this adhesive function associated with it. So if that's true, aren't we down a road where there are problematic questions raised with regard to indefiniteness of written description? Because you say it has some, you're sort of functional, a functional sort of claiming. And if you don't know what level of adhesion is required, the spec doesn't speak to that at all, right? So, Your Honor, I would say that we are not down the path of indefiniteness for several reasons. First, I think indefiniteness is not an issue that can be brought before the board. And so we're not faced with a lot of evidence as to whether one of Warren's skill in the art would understand the meaning of the term bond layer if a specific degree of adhesion was not specified as part of the construction or in the specification. I think it's clear, our position is that one of Warren's skill in the art would understand what would need to be done in the context of this sort of invention in this field. So why can't we draw on all, I guess, and there's some discussion in the briefs about an alternative construction, which is, even if you construe it as bond, does not, whether or not the Tarantieva reference also has the same or similar composition. Well, so I will say, to respond to your question, Your Honor, so Tarantieva, when it describes its coating, it says its complicated layer adheres to the substrate itself. And what we're looking for in terms of construction is that the bond layer needs to adhere another layer to the substrate. There's nothing in Tarantieva that teaches that its layer would adhere to this BSAS or the Getium silicate that is recited by the claims. So Tarantieva... Why can't we make that leap? I mean, either it has the ability to adhere, I mean, you're right, I mean, nothing is ever perfect, but why is that enough to say, okay, you know, even in an obviousness inquiry or whatever. Well, I think both sides experts agree that there are several factors one needs to consider when you know whether or not two materials will be compatible with each other. And it's clear that not all materials that meet the requirements of the claim may necessarily adhere to each other. And there's not a problem that... And really, we're looking... I think we're in this position because we're looking through the lens of hindsight. It's not a problem if not every species of the claim is operable. It could be that it may be not. Now, only with hindsight do we know, by using the patent specification as a guide, do we know that our inventors determined that this particular kind of combination may have this adhesive properties. But the specification we're talking about doesn't mention that at all, right? The specification discloses that an improved bond coat that certainly serves the function of this bond, because it's a bond coat, it serves the function of having adhesion, and then the improvement is in the area of fracture toughness. The inventors below in the patent are not required to describe why they thought they'd have a reasonable expectation of success or why they had a motivation to put these materials together. Their requirement is to tell you what they discovered, and the genius behind it is really not a requirement in the Patent Act. So I don't think it's appropriate to apply the standard that GE had to meet for reasonable expectation of success to deciding how great or how complete or how appropriate the specification is of the patent. And I think we're mixing two inquiries there. Excuse me. I think it's inappropriate. If there is some infirmity with the specification and we don't think there is at all, it is not the time to address that before the board, and we can't raise the specter of potential 112 issues in order to completely eliminate a claim limitation from the claim in the terms of a bond layer, regardless of how much detail is in the specification. I understand that this patent is directed to an improvement over a prior invention, and it was discovered that this bond layer was important. Does the earlier patent talk about the bond layer and its adhesive purpose? It actually does, Your Honor, and so I can give you a couple of citations if you would like them. And so this is the Eaton 356, and so I think there's really no dispute that Eaton 356 is kind of this earlier invention. And if you look at its description and the background of the 360 patent, I think it's so. So in Eaton 356, if I can get my glasses, I apologize. Is that in our joint appendix? It is. All right, so let me get you to page in Eaton 356. The Eaton 456 is at appendix 321. Well, that talks about an intermediate layer providing adhesion, and then it talks about a bond layer, which is different, and it doesn't mention adhesion. Well, it also says on column 4, looking around line 20, excuse me, yes, 13, it says in addition to the intermediate layer, you may have a bond. Bond layer may be provided between the silicon-containing substrate and the intermediate layer, and the suitable bond layer includes silicon. That's the one that doesn't mention adhesion, which is different from the intermediate layer that does, which is column 3, line 60-something. I agree that the intermediate layer does talk about doing adhesion, but I think if we go on, it also says that the silicon-containing substrate may be pre-oxidized to provide an SIO bond layer, right? So if you pre-oxidize to create this SIO bond layer, I think we see elsewhere that this SIO layer, it says down here at the bottom of column 3, perhaps when you were looking, it says that the intermediate can be SIO, and it also has that adhesive function. So I think when you read it in context as a whole, there is a connotation that the bond layer is doing adhesion, and then I'll add, even in the 360 patent, when it talks about the environmental barrier system having adhesive properties, it says these prior art systems have adhesive properties, it refers back up to the composition of what that layer is, and I'm just going to get you the citation. So this is in column 1 that says around lines 31, the prior art environmental barrier systems are adherent, and immediately up in that column, it talks about what that system is. It's a bond layer on the bottom, there may be an intermediate layer, then there's a barrier layer, and there may be an optional layer. And so even the 360 patent, I think in context, connotes that the prior art had this idea of when they had a bond layer, it had this adhesive property. And so with the ordinary meaning coupled with, you know, there's nothing in the written abbreviation, there's no disclaimer, there's no lexicography, we think it was error to get rid of the notion of bond. But to get back to your point, Judge Prost, there should be a reversal here, because there's nothing in Tarantiva, and there's nothing in the record below, where there is any showing that Tarantiva's layer can be used to... That would require us to make a fact-finding in the first instance. You know, I take your point, Your Honor. I think there are cases, like the Owings-Coryan case, when there's only one reasonable explanation that you can reverse. But I take your point, if you don't think there's only one reasonable explanation, the appropriate relief would be remand. But I think this case can fall, does fall into the Owings-Coryan sort of scenario, where there's only one reasonable finding, given the complete lack of proof on this issue below. Remember... The petition doesn't say anything about bonding or adhering? Not bonding the EBL, the environmental barrier layer, to the substrate. It talks about how Tarantiva has adhesive to bond itself to the substrate, and that's not quite what the claim requires. But not the bonding layer, in terms of having the top layer bound to the substrate, through the bonding layer. I think that's what you're talking about. That is what I'm saying. I think that is a showing that would need to be made, was utterly not made below, and so a remand would be futile on that point. Okay, why don't we hear from the other side, and then we'll return. Thank you, Your Honors. May it please the Court, Brian Ferguson for Appellate GE. The Board's construction of a bond layer was correct here, because it is the construction that is consistent with the intrinsic evidence. What about the word bond? I mean, that's part of the intrinsic evidence. It appears both in the specification and in the claims. It does, and there is not a single statement anywhere in the intrinsic evidence, the specification or the file history, where the applicants provided a disclosure that that bond layer had any type of adhesion properties whatsoever. In a plain and ordinary meeting, when we conclude that a claim term has a plain and ordinary meaning, that's confirmed by the extrinsic evidence. We go to the extrinsic evidence for that query, not necessarily to the specification. So why is this case any different? Because when you go to that intrinsic evidence, for example... No, I'm talking about when you go to the extrinsic evidence, when you're trying to determine whether or not there's a plain and ordinary meaning to the word bond, you're necessarily looking to the extrinsic evidence. Two things on that, Your Honor. First of all, what was submitted with respect to the ordinary meaning of bond or bond layer was a Webster's Dictionary, a general purpose dictionary. That general purpose dictionary does not confirm that the only construction of the word bond is to adhere. If you look at the dictionary definition, it's on page 1082 of the appendix. One of the alternate constructions is listed as D, and it includes a fusible ingredient that combines, unites, or strengthens. And when you look at the intrinsic evidence, the very point of the bond layer in the intrinsic evidence is to strengthen. It's to provide improved fracture toughness for the article that employs the bond layer. Now, that wasn't the only extrinsic that was evidence. That's right, Your Honor. There was other evidence. And additionally, the board didn't make the argument that you're making right now, right? No, the board... They didn't even consider this extrinsic evidence. The board said that the better course of action is to follow precedent from this court in terms of looking at what the intrinsic evidence says with respect to the claim construction. But isn't the whole point of claim construction to determine what the meaning of a term is to one of ordinary skill in the art? Of course. So, in a case where a term has an ordinary meaning that's well accepted, don't we have to credit that and start with that? And then you can look to the specification to see if there's something that changes that meaning or where the patent applicant tried to be their own lexicographer, for example. Well, that would be my point, Your Honor. When we look at the extrinsic evidence, first of all, the dictionary definition I don't think provides the support. Second of all, we have, like, two articles that...or patent that the other side... One more time, just for a minute. I'm sorry. But... Sure. So, I understand you to be now taking the position that the term bond layer does not have... A universally accepted meaning. Absolutely. Okay. I think Judge Lori pointed out that even in the Eaton reference, there is a reference to an intermediate layer that has adhesive properties. That just defines the meaning of intermediate layer. There's a reference to a bond layer that doesn't indicate that it has adhesive properties. It's very similar to what's in the disclosure of the 360 patent. The purpose of the 360 patent layer is to provide strengthening for the article overall. There's not a single disclosure in this patent that indicates anywhere that it must have... a layer to the substrate. The problem with that construction is that it's... One, there's no support in intrinsic evidence. In the file history, the examiner stated that as long as there is a layer on top of the bond layer, it's effectively functioning as the claimed bond layer and that any reference to adhesion properties are unclaimed limitations that are not commensurate with the scope of the claim construction for a minute. I mean, I can see that as potentially being a problem when you go to the next step of does the printer teach the claim limitation. But how does that prosecution history define what a bond layer is? Well, one of the issues with the prosecution history, as this court said in both Phillips and the Monsanto case, A78F3rd 1356, is that the file history isn't just an indication of how the patentee understood the invention, but it's also an indication of how the PTO understood the patent. And here, the PTO understood the claim as not requiring an adhesive property. And so the Patent Office, and this is the Office of Action at pages 122 and 123 of the file history, they said specifically the Tarantiva layer functions as a bond layer because when it has the optional outer coat, it's between, it has the chemical properties and it's located between the substrate and an outer layer. Therefore, it functions as a bond layer. And the applicant never contested that. So that is at least an indication that is consistent with how a person of ordinary skill looking at the intrinsic evidence would say, yeah, I've looked at this. I've looked at the file history. In the file history, the examiner understood the bond layer as not requiring adhesion. A bond must hold a couple of things together, right? And how does it do it other than by adhesion? Or strengthening. But I think, Your Honor, when you're looking at these layers, I think it should be understood that there must be something that is going to allow them to stay together. I mean, it could be something like pressure on top of them. It doesn't necessarily have to be adhesion. Now, the problem with UTC's construction is that it is limited to being designed to adhere another layer to the substrate. That is inconsistent with what is in the specification, Your Honor. The specification says specifically that you can also have an intermediate layer between the substrate and the bond layer. You can also have an intermediate layer between the bond layer and the outer BSAS layer. So, in that case, how is that designed to adhere an outer layer to the substrate? In that case, the intermediate layers are the one performing the adhesion functionality. So, the board was correct to reject their construction, not only because it has no support in the intrinsic evidence, but because it's overly narrow in light of what's in the specification. But what about the board's construction, which just repeats language that's already in the claim and doesn't give any meaning whatsoever to the word bond? Two things, Your Honor. First of all, we would disagree that it doesn't give any meaning to the layer bond because, again, the point of the bond layer in the claim is to provide an overall strengthening in improving the fracture toughness of the article that contains the layer. That's very clear from the specification. It's at columns 1, 61 to 66, and column 2, lines 43 to 46. That's the purpose of the bond layer. So, the board's construction includes the chemical composition that provides that toughness, that provides that strengthening. And then number two, the board's construction, again, the board said it was based on where it's located in the article and also what it's made up of. But it says that it's any layer located between at least two other layers or between the substrate and another layer. And it's that limitation or it's that… You mentioned chemical materials. A chemical bond doesn't have adhesion, right? It doesn't. A chemical bond is what, shared electrons? It's like an attractive force between them. Yeah, but we're not talking about atomic bonding here. That's right, Your Honor. This is not. This is a layer. That's not a good analogy. It's a chemical. Right. The bond coat or the bond layer that's in this 360 patent is a chemical structure, a composition that has certain properties. So where the board's construction says any layer located between at least two other layers or between the substrate and another layer, it's that between at least two other, any two layers recognizes what is in the specification, that the bond layer does not necessarily lie directly between the substrate and the BSAS layer, which is the barrier layer. UTC's construction would read that out because UTC's construction is designed to adhere another layer to a substrate. So their construction is overly narrow in light of the intrinsic evidence, and therefore it's inconsistent with the intrinsic evidence. If there are any more questions regarding the claim construction, I would want to address the reasonable expectation of success. Well, could you just address, because you didn't have, I mean, the Gray brief responds to the, again, a very hypothetically assuming we were to remand the discussion of whether under SAS you would want the board to consider the non-instituted grounds. And at page 31 of Gray, they make an argument about that. So do you have anything more to add on that? Well, yes. One, we did say in our red brief that if this board were to alter the claim construction, the appropriate remedy is not a reversal, it's a remand, at least because there is another ground that the board instituted on but did not provide any analysis of in light of the fact that they believe that the first ground, the ground of Eaton and Tarantino, was the appropriate grounds for invalidity. But two, we did, GE did, in the proceedings below, provide a discussion in our petitioner's reply brief. You're saying that they, so SAS deals with non-instituted claims. You're saying, this is a little bit different, I'm understanding you. You're just saying if hypothetically we were to remand it, there's an alternative ground that was instituted on that you think the board should consider? Yes, because the board did not provide any analysis of the second ground. They did institute on it, but they did not provide any analysis of it. Now, with respect to Tarantino, we did include a teaching, or we did include a discussion in the reply brief. It was at, this is in our, this is in the appendix at page 1870. It does discuss the fact that, yes. You're talking like before the board. Yes, this is before the board, yes. In a footnote, I think? It is, Your Honor, but I will say, it's a footnote that takes up two-thirds of the entire page, and it contains a complete argument with respect to if the board were to find that Tarantiva, or that the claim required some sort of adhesion, who knows what type, but if it does, then there is a discussion in Tarantiva itself that Tarantiva has adhering properties, and that is something that the board could consider on any remand. To answer Your Honor's question with respect to the 112 issue, this isn't a situation where what we're saying is, if this court reads the claim construction as requiring an adherence, one, there is no disclosure in that in the specification, so how much adherence is designed to hold the BASS layer to the substrate is a serious question this patent has. But the point is that because this patent provides absolutely no teaching whatsoever of the amount of adherence, then a person of ordinary skill in the art reading Tarantiva would certainly understand the type of adhesion that it would need as well in order to function properly. It's a question of... You think they would not understand? They would understand. They would understand. If they would understand it when they're... I think you're saying that the term would be broad then. Right. It could be anything. At the point being, Your Honor, if a person of ordinary skill in the art is allowed to read the 360 patent and say, oh, I know how much adhesion to use, well, that same knowledge has to be applied when the person of ordinary skill in the art is reading the prior art as well. Even though Tarantiva may not say exactly how much adhesion it has, it does teach that it has adhesion and a person of ordinary skill in the art would be able to apply their knowledge in order to successfully use the Tarantiva layer with the disclosed Eaton layer. Are there any other questions for me? No. Thank you, Your Honors. Please support. Just a couple of reactions here. The first thing is I think if you look in the record below, GE never really disputed the ordinary meaning of a bond as having this adhesive quality and just having to suggest now there's some great ambiguity there I think is not really consistent with the position below. But in any event, I think the record is abundantly clear that adhesion is part and parcel of the bond. Well, if you're saying that they never disputed that and they always thought that, then that also leads one to suggest that the prior art that they were discussing that they thought was sufficient to result in the patent being obvious, also their view was that that included the same. I think that's not true at all. I think it was a deliberate decision not to make a case on the issue of whether Tarantiva discloses that it could adhere the BSAS in their secondary reference Eaton 456 to the substrate. They never made that showing. There's nothing in Tarantiva where Tarantiva talks about adhesion. It is not with respect to BSAS. So they made a deliberate attempt below to read bond out of the claim because they knew their art couldn't get them there, and they made no showing. So I would disagree with that, Your Honor, that they knew this was going to be an issue. I'm sorry. I may have misunderstood. I thought you were making the argument that they didn't dispute below that adhesion was required under the bond. No, I'm saying the ordinary meaning is something they never challenge, and now they're saying it has to do with strength and not adhesion, and I think that is somewhat new. But the record is clear that adhesion is the key part. With respect to our construction, Your Honor, it goes without saying I think that she's clear to point out that adhesion is the key part of our construction, and we talk about adhering another layer to the substrate. That could be the intermediate layer. I think nothing counsel said really detracts from that. And with respect to the remand, it's actually quite interesting. So if you were not to reverse on bond and remand anyway, would there be an opportunity to address the second ground? That is an unusual posture from this court. Usually the remands say we won't rule at all and we'll make everything get redone and brought up. There is a lot of overlap between the two and would kind of lead to your judgment if there is a remand rather than reversal, how you would like to handle the FAS issue. Thank you. We thank both sides. The case is submitted. That concludes our proceeding for this morning. All rise.